UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SYBIL AHMAD, | : | |
| | : | |
| Plaintiff | : | No. 4:11-CV-01342 |
| | : | |
| vs. | : | (Judge Nealon) |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| COMMISSIONER OF SOCIAL | : | **FILED** |
| SECURITY, | : | **SCRANTON** |
| | : | |
| Defendant | : | NOV 0 8 2012 |

MEMORANDUM

PER _____

DEPUTY CLERK

## Background

The above-captioned action is one seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff Sybil Ahmad's claim for social security disability insurance benefits and supplemental security income benefits.

Ahmad protectively filed[1] an application for disability insurance benefits on July 17, 2008, and an application for supplemental security income benefits on July 31, 2008. Tr. 9, 21, 57, 86, 90-98 and 105.[2]  On September 8, 2008, the Bureau of Disability Determination[3] denied Ahmad's applications. Tr. 59-66.

_____

1.  Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

2.  References to "Tr.__" are to pages of the administrative record filed by the Defendant as part of his Answer on September 21, 2011.

3.  The Bureau of Disability Determination is an agency of the

(continued...)

On October 23, 2008, Ahmad requested a hearing before an administrative law judge. Tr. 9 and 68.  After over 15 months had passed, a hearing was held on February 2, 2010. Tr. 9 and 19-55. On March 11, 2010, the administrative law judge issued a decision denying Ahmad's applications. Tr. 9-18.  On March 29, 2010, Ahmad requested that the Appeals Council review the administrative law judge's decision. Tr. 82-85.  After about 15 months had passed, the Appeals Council on June 28, 2011, concluded that there was no basis upon which to grant Ahmad's request for review. Tr. 1-4. Thus, the administrative law judge's decision stood as the final decision of the Commissioner.

Ahmad then filed a complaint in this court on July 20, 2011.  Supporting and opposing briefs were submitted and the appeal[4] became ripe for disposition on December 23, 2011, when Ahmad elected not to file a reply brief.

For the reasons set forth below, the Court will affirm the decision of the Commissioner denying Ahmad's applications for disability insurance benefits and supplemental security income benefits.

Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the

---

3.   (...continued)
state which initially evaluates applications for disability
insurance benefits and supplemental security income benefits on
behalf of the Social Security Administration.   Tr. 59 and 63.

4.   Under the Local Rules of Court "[a] civil action brought to
review a decision of the Social Security Administration denying a
claim for social security disability benefits" is "adjudicated as
an appeal."   M.D.Pa. Local Rule 83.40.1.

individual has worked long enough and paid social security taxes. The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." It is undisputed that Ahmad meets the insured status requirements of the Social Security Act through December 31, 2013. Tr. 9 and 11.

Supplemental security income (SSI) is a federal income supplement program funded by general tax revenues (not social security taxes). It is designed to help aged, blind or other disabled individuals who have little or no income.

Ahmad was born in the United States on March 20, 1964, and at all times relevant to this matter was considered a "younger individual"[5] whose age would not seriously impact her ability to adjust to other work. 20 C.F.R. §§ 404.1563(c) and 416.963(c). Tr. 25, 86 and 96.

During Ahmad's elementary and secondary schooling she attended regular education classes. Tr. 28. Ahmad withdrew from high school after completing the 10th grade and obtained a General Equivalency Diploma in 1987. Tr. 28, 50 and 120. Ahmad can read, write, speak and understand the English language and perform basic mathematical functions. Tr. 113 and 135. In 1999, Ahmad completed an income tax preparation course through H & R Block. Tr. 28 and 121.

---

5. The Social Security regulations state that "[t]he term younger individual is used to denote an individual 18 through 49." 20 C.F.R., Part 404, Subpart P, Appendix 2, § 201(h)(1).

Ahmad has past relevant employment[6] as (1) an income tax preparer which was described as semi-skilled, sedentary work by a vocational expert, (2) an office cleaner which was described as unskilled, light work, and (3) an industrial cleaner which was described as unskilled, heavy work.[7] Tr. 50.

---

6.  Past relevant employment in the present case means work performed by Ahmad during the 15 years prior to the date her claim for disability was adjudicated by the Commissioner.   20 C.F.R. §§ 404.1560 and 404.1565.

7.  The terms sedentary, light, medium and heavy work are defined in the regulations of the Social Security Administration as follows:

> (a) *Sedentary work.* Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

> (b) *Light work.*  Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

> (c) *Medium work.*  Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.  If

(continued...)

4

Records of the Social Security Administration reveal that Ahmad had earnings in the years 1980 through 1987 and 1999 through 2008. Tr. 106. Ahmad's highest annual earnings were in 2001 ($12,875). Id. Ahmad's total reported earnings were $109,863.94. Id. Ahmad testified at the administrative hearing held in this case on February 2, 2010, that she has not worked since April 26, 2008. Tr. 28.

Ahmad claims that she became disabled on April 26, 2008,[8] because of degenerative joint disease and a Type 1 Arnold Chiari Malformation.[9] Doc. 8, Plaintiff's Brief, p. 2; Tr. 114.

---

7. (...continued)
        someone can do medium work, we determine that he or she can do sedentary and light work.

        (d) *Heavy work*. Heavy work involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can do heavy work, we determine that he or she can also do medium, light, and sedentary work.

20 C.F.R. §§ 404.1567 and 416.967.

8. Ahmad was 44 years old on the alleged disability onset date.

9. The National Institute of Health's website describes a Chiari malformation as follows:

        Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance. When the indented bony space at the lower rear of the skull is smaller than normal, the cerebellum and brainstem can be pushed downward. The resulting pressure on the cerebellum can block the flow of cerebrospinal fluid (the liquid that surrounds and protects the brain and spinal cord) and can cause a range of symptoms including dizziness, muscle weakness,
        (continued...)

Ahmad contends that she has severe pain in her shoulders and neck
which travels into the lower part of her head and severe pain in
her lower back when standing for any length of time or sitting too
long. Tr. 114.  Ahmad claims that she stopped her most recent work
as an income tax preparer because she had difficulty sitting at a
computer and using a telephone due to numbness in her arms; she can
no longer walk her dog, drive only short distances and often
requires the assistance of her daughter to drive her to doctor's
appointments and to the grocery store; she has difficulty with her
personal care including brushing her teeth, brushing her hair and

9.   (...continued)
        numbness, vision problems, headache, and problems with
        balance and coordination.  There are three primary
        types of CM.  The most common is Type I, which may not
        cause symptoms and is often found by accident during
        an examination for another condition. Type II (also
        called Arnold-Chiari malformation) is usually
        accompanied by a myelomeningocele-a form of spina
        bifida that occurs when the spinal canal and backbone
        do not close before birth, causing the spinal cord to
        protrude through an opening in the back.  This can
        cause partial or complete paralysis below the spinal
        opening.  Type III is the most serious form of CM, and
        causes severe neurological defects.  Other conditions
        sometimes associated with CM include hydrocephalus,
        syringomyelia, and spinal curvature.

See NINDS Chiari Malformation Information Page, http://www.
ninds.nih.gov/disorders/chiari/chiari.htm (Last accessed November
6, 2012).  "Chiari malformations (Cms) are structural defects in
the cerebellum, the part of the brain that controls balance.
Normally the cerebellum and parts of the brain stem sit in an
indented space at the lower rear of the skull, above the foramen
magnum (a funnel-like opening to the spinal canal). When part of
the cerebellum is located below the foramen magnum, it is called
a Chiari malformation," NINDS Chiari Malformation Fact Sheet,
http://www.ninds.nih.gov/disorders/chiari/detail_chiari.htm#19413
3087 (Last accessed November 7, 2012).

showering; she can no longer lift her grandson or even have her grandson sit on her lap without experiencing pain after a few minutes; she has difficulty sleeping, causing her fatigue during the day, requiring her to take two to three naps, for 20 minutes each time, each day; she experiences pain and fatigue to the point that she has to rest from the time she takes a shower before dressing herself; she can only walk or stand for 5 minutes at a time; she has difficulty reaching in front of her and overhead because of pain in her right shoulder; she has difficulty gripping with her right hand to the point that she drops things; she experiences side effects from the medications she takes, including dizziness, dry mouth and the ability to focus and concentrate on tasks; she experiences difficulty going up and down stairs and no longer uses the second story of her home; she experiences difficulty picking up small items; and she must work at her own pace. Tr. 27-35 and 40-48. She contends that she is totally disabled as the result of physical impairments and cannot engage in any type of work. Id. Ahmad does not contend that she is disabled as the result of a psychiatric disorder.

**Standard of Review**

When considering a social security appeal, we have plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181

F.3d 429, 431 (3d Cir. 1999); <u>Krysztoforski v. Chater</u>, 55 F.3d 857, 858 (3d Cir. 1995).  However, our review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." <u>Id.</u>; <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir. 1988); <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993).  Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001)("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981)("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence.");  <u>Keefe v. Shalala</u>, 71 F.3d 1060, 1062 (2d Cir. 1995); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001);  <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988)(quoting <u>Consolidated Edison Co. v. N.L.R.B.</u>, 305 U.S. 197, 229 (1938)); <u>Johnson v. Commissioner of Social Security</u>, 529 F.3d 198, 200 (3d Cir. 2008);  <u>Hartranft v. Apfel</u>, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere

scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight."  Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Johnson, 529 F.3d at 203; Cotter, 642 F.2d at 706-707. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

**Sequential Evaluation Process**

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful

9

activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner utilizes a five-step process in evaluating disability insurance and supplemental security income claims. See 20 C.F.R. §404.1520 and 20 C.F.R. § 416.920; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity,[10] (2) has an impairment that is severe or a combination of impairments that is severe,[11] (3) has an

---

10. If the claimant is engaging in substantial gainful activity, the claimant is not disabled and the sequential evaluation proceeds no further. Substantial gainful activity is work that "involves doing significant and productive physical or mental duties" and "is done (or intended) for pay or profit." 20 C.F.R. § 404.1510 and 20 C.F.R. § 416.910.

11. The determination of whether a claimant has any severe
(continued...)

10

impairment or combination of impairments that meets or equals the requirements of a listed impairment,[12] (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national

---

11.  (...continued)
impairments, at step two of the sequential evaluation process, is a threshold test. 20 C.F.R. §§ 404.1520(c) and 416.920(c). If a claimant has no impairment or combination of impairments which significantly limits the claimant's physical or mental abilities to perform basic work activities, the claimant is "not disabled" and the evaluation process ends at step two.  Id.  If a claimant has any severe impairments, the evaluation process continues.  20 C.F.R. §§ 404.1520(d)-(g) and 416.920(d)-(g). Furthermore, all medically determinable impairments, severe and non-severe, are considered in the subsequent steps of the sequential evaluation process.  20 C.F.R. §§ 404.1523, 404.1545(a)(2), 416.923 and 416.945(a)(2). An impairment significantly limits a claimant's physical or mental abilities when its effect on the claimant to perform basic work activities is more than slight or minimal. Basic work activities include the ability to walk, stand, sit, lift, carry, push, pull, reach, climb, crawl, and handle. 20 C.F.R. § 404.1545(b).  An individual's basic mental or non-exertional abilities include the ability to understand, carry out and remember simple instructions, and respond appropriately to supervision, coworkers and work pressures. 20 C.F.R. § 1545(c).


12.  If the claimant has an impairment or combination of impairments that meets or equals a listed impairment, the claimant is disabled. If the claimant does not have an impairment or combination of impairments that meets or equals a listed impairment, the sequential evaluation process proceeds to the next step. 20 C.F.R. § 404.1525 explains that the listing of impairments "describes for each of the major body systems impairments that [are] consider[ed] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  Section 404.1525 also explains that if an impairment does not meet or medically equal the criteria of a listing an applicant for benefits may still be found disabled at a later step in the sequential evaluation process.

economy. Id.  As part of step four, the administrative law judge
must determine the claimant's residual functional capacity. Id.[13]

Residual functional capacity is the individual's maximum
remaining ability to do sustained work activities in an ordinary
work setting on a regular and continuing basis. See Social
Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular
and continuing basis contemplates full-time employment and is
defined as eight hours a day, five days per week or other similar
schedule. The residual functional capacity assessment must include
a discussion of the individual's abilities.  Id; 20 C.F.R. §§
404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual
functional capacity' is defined as that which an individual is
still able to do despite the limitations caused by his or her
impairment(s).").

**Medical Records**

Before the Court addresses the administrative law
judge's decision and the arguments of counsel, Ahmad's medical
records will be reviewed.

_____

13.  If the claimant has the residual functional capacity to do
his or her past relevant work, the claimant is not disabled.

The alleged disability onset date was April 26, 2008. The Court will start by reviewing the medical records which reveal treatment and examinations prior to that date.

On January 29, 2007, Ahmad had an x-ray of the right shoulder. Tr. 150.  That x-ray revealed no bony abnormalities; the joint spaces were preserved and the articular surfaces smooth; there were no abnormal lytic or blastic changes; and there were no soft tissue calcifications seen. Id.  The x-ray was described as a "[n]ormal study." Id.

On November 5, 2007, Ahmad had an appointment with Michael F. Lombard, M.D., a treating physician. Tr. 156. At that appointment, Ahmad complained of "[right] shoulder pain radiating to elbow [times] 2 [weeks]." Id.  Dr. Lombard's physical examination of Ahmad revealed the following: "Palpable spasm and tenderness appreciated, right trapezium.[14]  Marked decreased range of motion, right shoulder.  Normal distal motor and neurovascular. Decreased range of motion, [cervical] spine." Id.  Dr. Lombard's assessment was that Ahmad suffered from a "cervical strain." Id. Dr. Lombard advised her to apply moist heat to her shoulder, rest and take the nonsteroidal anti-inflammatory pain medication Naprosyn. Id.

---

14.  The "trapezium" refers to the trapezius muscle which is a large muscle at the base of the neck running down to the shoulder blades.

On November 8, 2007, Ahmad had x-rays of the cervical spine (lateral, oblique and open mouth views) performed. Tr. 161. The x-rays revealed 4 millimeters of anterolisthesis of C4 over C5[15] with reversal of the cervical lordosis[16] at that level and degenerative joint disease throughout the cervical spine. Id.

On November 19, 2007, Ahmad had an appointment with Dr. Lombard. Tr. 155.  At that appointment, Ahmad stated that there was "no improvement in [her] shoulder." Id.  Dr. Lombard's physical examination of Ahmad revealed the following: "Decreased range of motion, [cervical] spine. Tenderness appreciated, right trapezium. Tenderness also over biceps tendon. Decreased range of motion, right shoulder as well. Normal distal motor and neurovascular. She does have tenderness in her left [sacroiliac] area as well. Negative straight leg raise.[17]  X rays show some pretty significant

---

15.  "In anterolisthesis, the upper vertebral body is positioned abnormally compared to the vertebral body below it.  More, specifically, the upper vertebral body slips forward on the one below." Cedars-Sinai, Anterolisthesis, http://www.cedars-sinai. edu/Patients/Health-Conditions/Anterolisthesis.aspx (Last accessed November 6, 2012).

16.  The cervical lordosis is the normal curve of the cervical spine. The normal curve looks like a very wide C, with the C pointing towards the back of the neck. In other words at or about the midline of the cervical spine, the cervical spine is bowed inward towards the voice box.

17.  The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc.  The patient, either lying or sitting with the knee straight, has his
(continued...)

[degenerative joint disease] of her [cervical] spine." Id.  Dr.
Lombard's assessment was that Ahmad suffered from cervical
radiculopathy,[18] tendinitis of the right shoulder, and lumbar back
pain. Id.  Dr. Lombard recommended that Ahmad take calcium and
Vitamin D, "invest in some physical therapy, heat massage,
ultrasound, stretching, strengthening + or - [cervical] spine
traction three days a week . . . for her neck, shoulder and back."
Id.  Dr. Lombard also prescribed the pain medication Vicodin. Id.

On January 4, 2008, Ahmad had an appointment with Dr.
Lombard at which Ahmad complained that she was "having an awful
time with her neck and back pain, headache, shoulder pain" and the
pain was not controlled by Vicodin or Darvocet. Tr. 154.  Dr.
Lombard's physical examination of Ahmad revealed the following:
"Mild elevation of blood pressure. Weight is down. Tender spasm

_____

17.  (...continued)
or her leg lifted.  The test is positive if pain is produced
between 30 and 70 degrees. Niccola V. Hawkinson, DNP, RN, Testing
for Herniated Discs: Straight Leg Raise, SpineUniverse,
http://www.spineuniverse.com/experts/testing-herniated
-discs-straight-leg-raise (Last accessed November 6, 2012).

18.  Radiculopathy is a condition where one or more nerves or
nerve roots are affected and do not work properly. The nerve
roots are branches of the spinal cord. They carry signals to the
rest of the body at each level along the spine. The nerve roots
exit through holes (foramen) in the bone of spine on the left and
the right. Radiculopathy can be the result of a disc herniation
or an injury causing foraminal impingement of an exiting nerve
(the narrowing of the channel through which a nerve root passes).
See, generally, Radiculopathy, MedicineNet.com, http://www.
medicinenet.com/radiculopathy/article.htm (Last accessed November
6, 2012).

appreciated, bilateral trapezium, with limited range of motion.
Normal motor and neurovascular. Abdomen: Soft and non-tender." Id.
Dr. Lombard's assessment was that Ahmad suffered from a "[h]istory
of gastroparesis"[19] and "[n]eck and low back pain." Id.  Dr. Lombard
ordered an MRI of the cervical spine as well as the lumbar spine
and considered referring Ahmad to a pain management specialist. Id.

On January 16, 2008, Ahmad had an MRI of the cervical
spine performed which revealed a Type 1 Chiari Malformation; slight
encroachment of the neural foramina at the C3-C4 levels; bilateral
encroachment of the neural foramina at the C4-C5 levels more on the
left with a minimal anterolisthesis of C4 over C5; disc osteophyte
(bone spur) complex at C5-C6 and C6-C7 with slight narrowing of the
central canal which is borderline stenotic;[20] and reversal of the
cervical lordosis. Tr. 160.  An MRI of the lumbar spine performed
on the same day revealed minimal disc bulging at the L5-S1 levels
with no central canal stenosis or neural foraminal encroachment; a
tear of the annulus fibrosus[21] at the L2-L3 level on the left with

---

19.  Gastroparesis is a condition that reduces the ability to the
stomach to empty its contents but there is no obstruction or
blockage. A.D.A.M. Medical Encyclopedia, PubMed Health, U.S.
National Library of Medicine, http://www.ncbi.nlm.nih.gov
/pubmedhealth/PMH0001342/ (Last accessed November 6, 2012).

20.  "Stenosis" is defined as "an abnormal narrowing of a duct or
canal[.]" Dorland's Illustrated Medical Dictionary, 1757 (32nd
Ed. 2012).

21.  The intervertebral discs (made of cartilage) are the
(continued...)

no compromise of the neural foramina; and a hemangioma at the T12

level.[22] Tr. 157-158.

On February 27, 2008, Ahmad had an appointment with

Joseph D. Paz, D.O., a pain management specialist. Tr. 176-179.

The report of this appointment reveals that Ahmad was smoking one

pack of cigarettes per day. Tr. 176. When Dr. Paz's physician's

assistant reviewed Ahmad's systems,[23] Ahmad complained of fatigue

and weakness, difficulty breathing, indigestion, changes in vision,

headaches, difficulty swallowing, pain, arthritis, anxiety and

---

21.  (...continued)
cushions (shock absorbers) between the bony vertebral bodies that
make up the spinal column. Each disc is made of a tough outer
layer and an inner core composed of a gelatin-like substance. The
outer layer of an intervertebral disc is called the annulus
fibrosus. Jill PG Urban and Sally Roberts, Degeneration of the
intervertebral disc, PublicMed Central,http://www.ncbi.
nlm.nih.gov/pmc/articles/PMC165040/(Last accessed
November 6, 2012); see also Herniated Intervertebral Disc
Disease, Columbia University Medical Center, Department of
Neurology, http://www.columbianeurosurgery.org/
conditions/herniated-intervertebral-disc-disease/ (Last accessed
November 6, 2012).

22.  "A spinal hemangioma is a primary, benign tumor most common
in the thoracic and lumbar spine. This type of tumor typically
affects the vertebral body, but also can affect muscles. The
tumor has few symptoms, and is often found on examination for
another condition." Scoliosis & Spine Associates, Spinal Tumors,
http://www.scoliosisassociates.com/subject.php?pn=spinal-tumors-0
12 (Last accessed November 6, 2012).

23.  "The review of systems (or symptoms) is a list of questions,
arranged by organ system, designed to uncover dysfunction and
disease." A Practical Guide to Clinical Medicine, University of
California, School of Medicine, San Diego, http://meded.ucsd.edu/
clinicalmed/ros.htm (Last accessed November 6, 2012).

trouble sleeping. Tr. 177.  A physical examination performed by the physician's assistant revealed limited cervical range of motion and diffuse muscular spasm; subjective radiating pain up the back of her head and into her right upper extremity upon palpation; full range of motion of the lumbar spine with subjective pain on extension, flexion and rotation; and bilateral paravertebral tenderness with mild paraspinous spasm to palpation. Tr. 177-178. Ahmad had normal muscle strength in the lower extremities; she had intact sensation to light touch; normal deep tendon reflexes; she had a slow but coordinated gait; she had the ability to stand on her heels and toes without difficulty;[24]  straight leg raises bilaterally to 90 degrees with increased pain; no radicular signs; and negative sacroiliac joint tenderness and negative Gaenslen's, Patrick's, Gillette's, Babinski's and clonus tests bilaterally.[25]

---

24.  The heel walk test requires the patient to walk on his heels. The inability to do so suggests L4-5 nerve root irritation. The toe walk test requires the patient to walk on his toes. The inability to do so suggests L5-S1 nerve root irritation. Clinical Examination Terminology, MLS Group of Companies, Inc., https://www.mls-ime.com/articles/GeneralTopics/Clinical%20Examination%20Terminology.html (Last accessed November 6, 2012).

25.  The Patrick's (Faber) test is "[a] test to determine the presence or absence of sacroiliac disease; with patient supine, the hip and knee are flexed and the external malleolus is placed above the patella of the opposite leg; this can ordinarily be done without pain, but, on depressing the knee pain is promptly elicited in sacroiliac disease." Medical Definition of Patrick's Test, Lexic.us, http://www.lexic.us/definition-of/Patrick's_test (Last accessed November 6, 2012). The Gaenslen's test is used to

(continued...)

Tr. 178.  The assessment of the physician's assistant was that
Ahmad suffered from neck pain, cervical facet syndrome, cervical
spasticity and cervical degenerative disc disease.  Id.  The
physician's assistant counseled Ahmad on the disadvantage of
smoking with chronic pain, gave Ahmad home stretching exercises to
perform, advised her to use heat prior to the exercises, provided
her with samples of the muscle relaxant Fexmid, scheduled her for a
bilateral cervical facet block series, and scheduled a follow-up
appointment in two months. Tr. 178-179.  The physician's assistant
discussed the treatment plan with Dr. Paz who approved the
treatment plan and then spoke to Ahmad about it. Tr. 179.

On March 31, April 14 and April 29, 2008, Dr. Paz
administered to Ahmad a trigger point release of the right and left

---

25.  (...continued)
detect musculoskeletal abnormalities and inflammation of the
lumbar vertebrae and sacroiliac joint. The Gillet or Gillette's
test is used to access abnormal movement of the sacroiliac joint.
The plantar response is a reflex of the foot tested by "scraping
an object across the sole of the foot beginning from the heel,
moving forward toward the small toe, and then arcing medially
toward the big toe."  This test is normal if there is a "downward
contraction of the toes."   An abnormal response "called the
Babinski's sign, is characterized by an upgoing big toe and
fanning outward of the other toes." Plantar Response,
Neuroexam.com, http://www.neuroexam.com/neuroexam/
content.php?p=32 (Last accessed November 6, 2012). The presence
of the Babinski's sign suggests brain or spinal cord injury.
Clonus is defined as an abnormal "alternate muscular contraction
and relaxation in rapid succession" and "a continuous rhythmic
reflex tremor initiated by the spinal cord below an area of
spinal cord injury, set in motion by reflex testing." Dorland's
Illustrated Medical Dictionary, 373 (32nd Ed. 2012).

trapezius muscles with a ".5% Marcaine, 2% Lidocaine mix 50/50 5 cc" and a posterior cervical facet steroid block under fluoroscopic guidance of the C3-C7 joints on the right and left with "Betamethasone 9 mgs in total 3 cc volume 0.5% Marcaine 1.5cc." Tr. 180-187. The findings of physical examinations performed on these dates by Dr. Paz were similar to the findings at the February 27, 2008 appointment. Id.

On August 7, 2008, Ahmad had a follow-up appointment with Dr. Paz. Tr. 189 Ahmad reported no improvement as a result of the injections she received in March and April. Id. Physical examination findings were basically unchanged from April, 2008. Id. Dr. Paz discussed with Ahmad the Chiari Malformation and noted that it was minimal. Id.

On August 21, 2008, Ahmad had an appointment with Dr. Lombard at which Ahmad complained of persistent neck pain. Tr. 153. Dr. Lombard's physical examination of Ahmad revealed the following: "Palpable tenderness and spasm, bilateral trapezium; right worse than left. Limited range of motion. Normal motor and neurovascular; Lungs: Clear. Cardiovascular: Regular rate and rhythm." Id. Dr. Lombard's assessment was as follows: "1. Smoking female. 2. Gastroesophageal reflux disease. 3. Cervical disc disease." Id. Dr. Lombard prescribed the antidepressant drug Cymbalta. Id.

On August 25, 2008, Ahmad had an MRI of the cervical spine which revealed the following: "Arnold-Chiari malformation. No

20

cord abnormalities noted otherwise. <u>No compression defect noted</u>
<u>within the upper cord or medulla at the level of the foramen</u>
<u>magnum</u>. Recommend further clinical correlation." Tr. 162 (emphasis
added).

On September 9, 2008, Louis Tedesco, M.D., reviewed
Ahmad's medical records on behalf of the Bureau of Disability
Determination and concluded that Ahmad had the medically
determinable impairments of cervical spondylosis, Type 1 Arnold
Chiari Malformation, degenerative joint disease, and a history of
gastrointestinal reflux disease but that she had the functional
ability to engage in a limited range of light work. Tr. 163-169.
Dr. Tedesco found that Ahmad could occasionally lift and/or carry
20 pounds, frequently lift and/or carry 10 pounds, stand and/or
walk about 6 hours in an 8-hour workday, and sit about 6 hours in
an 8-hour workday; Ahmad had an ability to push and/or pull 20
pounds occasionally and 10 pounds frequently, the ability to
occasionally use ramps and climb stairs but never climb ladders,
ropes or scaffolds; Ahmad had the ability to occasionally kneel,
crouch and crawl and frequently balance and stoop; and Ahmad had no
manipulative, visual, communicative or environmental limitations.
<u>Id.</u>

On October 24, 2008, Ahmad had an appointment with John
D. Cantando, D.O., a neurosurgeon. Tr. 200-202.  The results of a
physical examination were essentially normal except for

21

mild bilateral spasm of the paracervical muscles, a positive
Lhermitte's sign with flexion of the neck with paresthesias in
upper extremities and some hyperreflexia in the lower extremities.[26]
Id.   Dr. Cantando referred Ahmad for an evaluation of her vocal
cords "before any possible chiari decompression [surgery]" and to
an opthamologist to have her vision checked. Id.   We did not find
any further reports from Dr. Cantando in the administrative record.
Ahmad, however, testified at the administrative hearing that her
vision was checked and it was noted that her vision was declining
but it was only attributable to her age and that she had a
"swallowing test with the ear, nose and throat doctor and they said
that was okay." Tr. 37.

On November 12, 2008, Ahmad had an MRI of the brain which
revealed the Type 1 Chiari Malformation. Tr. 204.

On November 2, 2009, Ahmad had an appointment with Dr.
Lombard at which Ahmad complained of epigastric pain. Tr. 194. Dr.
Lombard noted no abnormal physical examination findings and his

---

26.   The Lhermitte's sign is defined as "the development of
sudden transient, electric-like shock spreading down the body
when the patient flexes the head forward; seen mainly in multiple
sclerosis but also in compression and other disorders of the
cervical cord." Dorland's Illustrated Medical Dictionary, 1700
(32nd  Ed. 2012). "Hyperreflexia" is defined as "dysreflexia
characterized by exaggeration of reflexes."  Dorland's
Illustrated Medical Dictionary, 887 (32nd  Ed. 2012).
"Dysreflexia" is defined as "disordered response to stimuli, as
in hyperreflexia[.]" Dorland's Illustrated Medical Dictionary,
579 (32nd  Ed. 2012).

assessment was "neck and back pain with history of Arnold Chiari malformation, gastroesophageal reflux disease, smoker with chronic obstructive pulmonary disease, and new onset of abdominal pain." . Id. Ahmad declined an ultrasound of the abdomen. Id.

## Discussion

The administrative law judge, at step one of the sequential evaluation process, found that Ahmad had not engaged in substantial gainful work activity since April 26, 2008, the alleged disability onset date. Tr. 11.

At step two of the sequential evaluation process, the administrative law judge found that Ahmad had the following severe impairments: "degenerative joint disease and Type 1 Arnold Chiari malformation[.]" Id.

At step three of the sequential evaluation process, the administrative law judge found that Ahmad's impairments did not individually or in combination meet or equal a listed impairment. Tr. 13.

At step four of the sequential evaluation process, the administrative law judge found that Ahmad could not perform her past relevant work but that she had the residual functional capacity to perform a limited range of sedentary work. Tr. 13-17. Specifically, the administrative law judge found that Ahmad could perform sedentary work except she only "can occasionally climb

ramps and stairs but never climb ladders, ropes or scaffolds; can
occasionally kneel, crouch, and crawl; can occasionally reach,
including overhead reaching, with the dominant right upper
extremity; can occasionally handle and finger with the dominant
right upper extremity; and requires a sit/stand option every 15
minutes." Tr. 13.  In setting this residual functional capacity,
the administrative law judge found that Ahmad's medically
determinable impairments could reasonably be expected to cause her
alleged symptoms but that her statements concerning the intensity,
persistence and limiting effects of those symptoms were not
credible to the extent they were inconsistent with the ability to
perform a limited range of sedentary work. Tr. 14. The
administrative law judge also relied on the opinion of Dr. Tedesco
who found that Ahmad could perform a limited range of light work
but instead of adopting Dr. Tedesco's opinion in toto the ALJ gave
Ahmad the benefit of the doubt and reduced Ahmad's residual
functional capacity to the sedentary level. Tr. 16.

   Based on the above residual functional capacity and the
testimony of a vocational expert, the administrative law judge, at
step five of the sequential evaluation process, found that Ahmad
could perform unskilled, sedentary work[27] as a surveillance system

---

27.  Dr. Tedesco found that Ahmad could perform light work. If an
individual can perform light work, he or she can also perform
sedentary work. 20 C.F.R. §§ 404.1567(b) and 416.967(b).

monitor and that there were a significant number of such jobs in the state economy. Tr. 9 and 52-54.

The administrative record in this case is 204 pages in length, primarily consisting of medical and vocational records. Ahmad makes a general argument that the ALJ's decision is not supported by substantial evidence. Ahmad also appears to argue that the ALJ's finding that she was not credible was erroneous and that the treating physician's medical notes and opinions establish that she is disabled.

The Court has thoroughly reviewed the record in this case and finds no merit in Ahmad's arguments. The administrative law judge did an excellent job of reviewing Ahmad's vocational history and medical records in her decision. Tr. 9-18. Furthermore, the brief submitted by the Commissioner thoroughly reviews the medical and vocational evidence in this case. Doc. 9, Brief of Defendant.

Initially, the Court notes that no treating or examining physician has indicated that Ahmad suffered from physical functional limitations that would preclude her from engaging in the limited range of sedentary work set by the administrative law judge in her decision for the requisite statutory 12 month period.[28]

---

28.  As stated earlier in this memorandum to receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

(continued...)

Furthermore, the Court cannot conclude from the bare medical records that Ahmad is totally disabled.  The administrative law judge identified an unskilled, sedentary job which Ahmad could perform.  No physician indicated that Ahmad was incapable of working at that modest level on a full-time basis.

The administrative law judge relied on the opinion of Dr. Tedesco, the state agency physician.  The administrative law judge's reliance on that opinion was appropriate. See Chandler v. Commissioner of Soc. Sec., 667 F.3d. 356, 362 (3d Cir. 2011)("Having found that the [state agency physician's] report was properly considered by the ALJ, we readily conclude that the ALJ's decision was supported by substantial evidence[.]").

The administrative law judge stated that Ahmad's statements concerning the intensity, persistence and limiting effects of her symptoms were not credible to the extent that they were inconsistent with the ability to perform a limited range of sedentary work. There is no basis to question that credibility judgment.  The administrative law judge was not required to accept Ahmad's claims regarding her physical limitations. See Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983)(providing that credibility determinations as to a claimant's testimony regarding

---

28.  (...continued)
for a continuous period of not less than 12 months."  42 U.S.C. § 432(d)(1)(A).

26

the claimant's limitations are for the administrative law judge to
make).  It is well-established that "an [administrative law
judge's] findings based on the credibility of the applicant are to
be accorded great weight and deference, particularly since [the
administrative law judge] is charged with the duty of observing a
witness's demeanor . . . ."  <u>Walters v. Commissioner of Social
Sec.</u>, 127 f.3d 525, 531 (6th Cir. 1997); <u>see</u> <u>also</u> <u>Casias v.
Secretary of Health & Human Servs.</u>, 933 F.2d 799, 801 (10th Cir.
1991)("We defer to the ALJ as trier of fact, the individual
optimally positioned to observe and assess the witness
credibility.").  Because the administrative law judge observed and
heard Ahmad testify, the administrative law judge is the one best
suited to assess the credibility of Ahmad.

The Court's review of the administrative record reveals
that the decision of the Commissioner is supported by substantial
evidence.  Therefore, pursuant to 42 U.S.C. § 405(g), the
decision of the Commissioner will be affirmed.

An appropriate order will follows.

**United States District Judge**

Dated: November 8, 2012

27